AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### District of Columbia

| United States of America | ) |
| --- | --- |
| v. | ) Case: 1:21-mj-00608 |
| | ) Assigned to: Judge Meriweather, Robin M. |
| FRANK RAFARACI | ) Assign Date: 9/21/2021 |
| | ) Description: COMPLAINT W/ ARREST WARRANT |
| | ) |
| Defendant(s) | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2011 to the present__ out of the jurisdiction of any particular State or District _____, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. s. 371 | Conspiracy to commit bribery |
| 18 U.S.C. s. 201 | Bribery |
| 18 U.S.C. s. 1349 | Conspiracy to commit wire fraud |
| 18 U.S.C. s. 1956(h) | Conspiracy to commit money laundering |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

*Cordell DeLaPena*
Complainant's signature

Special Agent Cordell De La Pena
Printed name and title

Sworn to before me and signed in my presence.

Date: September 21, 2021

Judge's signature

City and state: Washington, D.C.   Hon. Robin M. Meriweather, U.S. Magistrate Judge
Printed name and title

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**FRANK RAFARACI,**<br>         Defendant. | Case: 1:21-mj-00608<br>Assigned to: Judge Meriweather, Robin M.<br>Assign Date: 9/21/2021<br>Description: COMPLAINT W/ ARREST WARRANT |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Cordell DeLaPena, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I am a Special Agent with the Department of Defense, Office of Inspector General, Defense Criminal Investigative Service ("DCIS"), European Resident Agency. I have been so employed since August 2012. Prior to my employment with DCIS, I was a Special Agent with the U.S. Department of the Interior, Office of Inspector General for approximately four years. As a Special Agent with the Departments of Defense and Interior, I have received training and participated in numerous in financial and white-collar criminal investigations, and I have personally conducted or assisted in complex financial fraud investigations involving allegations of bribery, kickbacks, public corruption, conspiracy, money laundering, mail and wire fraud, fraud against the United States, and antitrust violations. I have received specialized training in the investigation of various financial and white-collar crimes, and I have personally conducted or assisted in the investigation of violations of U.S. law, including health care fraud, bribery, public corruption, and money laundering violations.

2.  From my work with DCIS, I have become familiar with the ways in which U.S. military and civilian agencies procure goods and services, including the types of authorizations and records that are required for these agencies to purchase goods and services. I have prepared

affidavits to support the establishment of probable cause for search and arrest warrants. I am familiar with the facts set forth below based upon my own investigative findings and conversations with other participating law enforcement agents.

3. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that FRANK RAFARACI ("RAFARACI"), a United States citizen who resides primarily in the United Arab Emirates ("UAE") and Italy, and has served as the Chief Executive Officer of Multinational Logistics Services ("MLS") since in or around 2005, and others, have committed violations of the following statutes: 18 U.S.C. § 371 (conspiracy to commit bribery), ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and 18 U.S.C. § 1956(h) (conspiracy to commit money laundering).

4. Specifically, as set forth below, I respectfully submit there is probable cause to believe that from at least in or around 2015 to in or around 2021, RAFARACI, and others, known and unknown, knowingly and intentionally conspired and agreed to bribe public officials to benefit RAFARACI's company.

5. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6. Lastly, as set forth below, I respectfully submit there is probable cause to believe that from at least in or around 2015 to in or around 2021, RAFARACI, and others, known and unknown, intentionally conspired to launder, and in fact laundered, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2

███████████████████████████ using a network of shell companies and fictitious transactions to disguise the origins of the ██████ and to evade U.S. federal income tax requirements and reporting.

7. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I learned from other law enforcement agents. Because this affidavit is limited in purpose, I am not including all facts known to law enforcement concerning this investigation. Instead, I have set forth only those facts that are necessary to establish probable cause for the complaint sought herein. In addition, where the contents of documents, or the action, statements, and conversations of others are reported herein, they are reported in sum and substance, and in part, except where otherwise indicated.

8. This Court has jurisdiction to issue the requested warrant pursuant to 18 U.S.C. § 3238 ("The trial of all offenses begun or committed…out of the jurisdiction of any particular State or district, shall be in the district in which the offender…is arrested or is first brought; but if such offender…[is] not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender…or if no such residence is known, the indictment or information may be filed in the District of Columbia"); *see also* 18 U.S.C. § 1956(f) (providing for extraterritorial jurisdiction over money laundering conduct if "conduct is by a United States citizen").

## PROBABLE CAUSE

### A. Relevant Individuals and Entities

9. The U.S. Navy operates ships around the world, and hires contractors to assist its ships with refueling, stocking provisions, and other services. These contractors are known as "husbanding service providers," and the services are known as "husbanding services."

3

10. MLS is a husbanding service provider for the U.S. Navy based in Malta and the UAE. Starting in at least as early as 2011, the U.S. Navy engaged MLS to provide husbanding services to the U.S. Navy at ports worldwide.

11. From approximately 2010 to present, the U.S. Navy, other Department of Defense components, and U.S. government civilian agencies, awarded husbanding services contracts to MLS worth approximately $1.3 billion.

12. The investigation has revealed that MLS's husbanding business has fewer than 30 employees, and furthermore, that RAFARACI, as the company's Chief Executive Officer, closely oversees MLS's business and employees.

13. CC-1 is a U.S. citizen residing in Italy and is the Chairman of MLS's Board of Directors.

14. CC-2 is or was a U.S. Navy official at various times from in or around October 2006 until in or around December 2017, and from July 2020 to present, CC-2 was a Marine Liaison Officer for the U.S. Navy Fifth Fleet in Manama, Bahrain. CC-2's official duties included supervising ship husbanding services in Bahrain, which included overseeing contractors such as MLS. CC-2 was at all relevant times a "public official" within the definition of Title 18, United States Code, Section 201(a)(1).

15. CC-3 acts as the chief financial officer for MLS. CC-3 is a citizen/resident of Malta.

B. **The Conspiracy to Commit Bribery**

16. From in or around 2015 to in or around 2021, MLS, acting through RAFARACI and other MLS employees, needed to be in regular contact with U.S. Navy officials worldwide to perform on its husbanding services contracts. In part to gain the approval of U.S. Navy officials, and to benefit MLS, RAFARACI, CC-1, and others, known and unknown, knowingly and

intentionally conspired to bribe CC-2.

17. CC-2 accepted and agreed to accept a "stream of benefits" of things of value in return for being corruptly influenced by RAFARACI, CC-1, and others, known and unknown, in the performance of his official acts, as opportunities arose.

18. CC-2 has admitted to his involvement in this conspiracy with RAFARACI; in June 2021, CC-2 pleaded guilty in this District to one count of conspiracy to commit bribery and is cooperating with the government's investigation in the hope of obtaining favorable consideration regarding a potential sentence. CC-2's criminal case is under seal.[1]

   a. **RAFARACI Pays the First Bribe to CC-2**

19. On or about July 11, 2015, CC-2 emailed CC-1 with the subject line, "Money," writing, "Hello, Hope this e-mail finds you and your family in good health and spirit. Can I please make a loan out to you for $20,000?"

20. On or about August 23, 2015, RAFARACI emailed CC-3, "Dear [CC-3], I'm in need of USD 20[,]000 cash for MLS Bahrain. Since I will be leaving tomorrow evening, please collect the cash from the bank and give it to [an individual] Who will be leaving to Dubai on Friday morning. Please confirm."

21. The following day, on or about August 24, 2015, CC-3 replied by email, "Dear Frank [RAFARACI] … I have made an order for USD 20,000 with the bank, to be delivered tomorrow. The Dollars were not available at the bank today. Regards, [CC-3]."

22. According to statements made by CC-2 in connection with CC-2's guilty plea, in or around August 2015, CC-2 met RAFARACI in the Diplomat Hotel in Manama, Bahrain, where

---

[1] CC-2 has met with U.S. law enforcement on several occasions, and initially denied that his solicitation and acceptance of things of value from RAFARACI and MLS was connected to his official duties for the U.S. Navy.

5

RAFARACI provided CC-2 with an envelope containing $20,000. CC-2 also indicated that RAFARACI told CC-2 that he would be in touch, and to "keep up the good work."

      b. **RAFARACI Pays a Second Bribe to CC-2**

23.    On or about March 27, 2018, while CC-2 was employed by the U.S. Army and was not located in Bahrain, CC-2 emailed CC-1, soliciting a loan for $13,500. CC-1 forwarded this loan solicitation email to RAFARACI.

24.    On or about April 20, 2018, CC-2 emailed RAFARACI, "Frank [RAFARACI], please call me."

25.    On or about May 6, 2018, according to statements made by CC-2 in connection with CC-2's guilty plea, CC-2 met RAFARACI in a hotel in Miami, Florida. RAFARACI provided CC-1 with an envelope containing $13,500.

26.    According to CC-2's admissions pursuant to his plea agreement, and my review of emails and government contracting documents, CC-2 solicited the bribes identified above from RAFARACI and CC-1 with the intent to be influenced in his official duties as Marine Liaison Officer. The bribes were solicited, and RAFARACI corruptly gave, offered, and promised these things of value, as part of a course of conduct of favors and gifts flowing to CC-2 in exchange for a pattern of official acts favorable to RAFARACI and MLS.

27.    From in or around 2013 to in or around 2021, MLS obtained over $100 million in U.S. Navy contracts in Bahrain.

  C. **The Conspiracy to Commit Wire Fraud Against the U.S. Navy**

28.    [REDACTED]

███████████████████████████████████████

29. From at least as early as 2011 to in or around 2018, MLS husbanding services contracts ("HSCs") with the U.S. Navy included the following pricing provisions, among others:

   a. The contracts provided for a daily flat-rate husbanding fee that was determined by a competitive bid process whereby the bidders' fees were disclosed to the U.S. Navy and then set in the awardee's contract.

   b. The contracts included competitively bid fixed price Contract Line Item Numbers ("CLINs") for supplies and services typically required to be provided or performed during port visit, such as sewage offload and the provision of potable water.

   c. The contracts included provisions for certain husbanding services that were to be provided "at cost" ("Port Authority Services"). Under these provisions, MLS passed its cost on to the U.S. Navy, and was prohibited from adding any markup to its cost.

   d. The contracts also included provisions for the purchase of services and supplies from local vendors ("non-CLIN items"). Like Port Authority Services, MLS was required to invoice non-CLIN items to the Navy at cost.

   e. ████████████████████████████████████████████████████████

      ████████████████████████████████████████████████████████

      ████████████████████████████

30. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

31. █████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████

32. █████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████  ████████████████
███████████████████████████████████

33. █████████████████████████████████████████████████
████████████████████████████████████
   █  ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

35. █████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████
   █  ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

8

███████████████████████████████████████████████
██████

37.     RAFARACI's authorization was required for nearly every payment made by MLS to any major subcontractor, supplier, or port authority, including the payments for Port Authority Services described above.

38.     ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

39.     The U.S. Navy paid and continues to pay MLS for its work on HSCs by transferring money into MLS's primary bank account, located in Malta (the "Malta Account"). These payments are made by wires in interstate and foreign commerce and originate from a Defense Finance Accounting Service account within the United States. CC-3 is a signatory on the Malta Account, and RAFARACI controls disbursements from the account.

D.  **The Conspiracy to Launder the Proceeds of the Scheme**

40.     From in or around 2015 to in or around 2021, emails and documents collected during this investigation demonstrate that RAFARACI, CC-1, CC-3, and others known and unknown, laundered the proceeds of ████████████████████████████████ ████ from the Malta Account into shell bank accounts for RAFARACI's personal use. The purpose of the conspiracy was to conceal and disguise the nature, location, source, ownership, and

9

control of the proceeds of the scheme to defraud.[2]

41. As part of this conspiracy, RAFARACI set up and maintained shell companies and bank accounts in the UAE and elsewhere. From my review of corporate documents and other records, these companies have no employees and served no legitimate business purpose.

42. Sinfonia was a RAFARACI shell company based in the UAE. According to business registration documents, emails, and invoices I have reviewed, Sinfonia is capitalized almost exclusively by the transmission of funds from MLS's corporate accounts in the United Kingdom and Malta to accounts in the UAE. Each of the transfers, which was connected to a fraudulent invoice from Sinfonia to MLS, resulted in the use of an international wire to effect the payment. *See generally* 18 U.S.C. § 1956(c)(4) (defining "financial transaction").

43. RAFARACI and CC-3 created false invoices from the shell companies, including Sinfonia, to MLS, which purported to be for providing husbanding services, to substantiate MLS's payments to the shell companies, when in fact the shell companies had performed no services. These invoices were supplied to MLS's banks to deceive the banks into authorizing payments that disguised the destination and nature of the transferred funds.

44. For example, on or about June 11, 2018, RAFARACI received an email from Financial Institution 1, a UAE-based financial institution, requesting explanations and backup documents for several large transfers from the Malta Account and another RAFARACI shell company into Sinfonia's account in the UAE.

45. RAFARACI forwarded the email to CC-3, "[CC-3], Here we are. What should I reply? Any idea? I think we better stop for now." CC-3 replied with draft answers, but cautioned,

---

[2] Wire fraud is a "specified unlawful activity" for purposes of the money laundering statutes. *See* 18 U.S.C. § 1956 (c)(7)(A) (incorporating 18 U.S.C. § 1961(1)).

"the next request will be for copies of the invoices from Sinfonia and MLS Investments." MLS Investments is another RAFARACI shell company incorporated in the same manner as Sinfonia.

46. After RAFARACI asked for advice on the invoices, CC-3 replied:

*Frank*
*I had prepared an invoice listing as we had discussed. I have been making payments according to that listing. The ones we have paid so far are those which should have been dated 2009 to 2010.*

*The invoices have to be issued by MLS Investments Limited and by Sinfonia Limited to MLS Gulf LLC. We had discussed using the narrative "Ship support services".*

*Regards*
*[CC-3]*

47. On or about June 26, 2018, CC-3 wrote to RAFARACI, "Attached are the copies of the requested invoices against which payment of Euro 158,950 was made." RAFARACI responded:

*[CC-3]*
*There is only one invoice for Sinfonia not matching euro 158950.*
*In addition I suggest you change invoice numbers as starting from 1 can be suspicious. Start 2018210 for Sinfonia and 2018 608 for MLS investment please.*
*Thanks*

48. On or about August 15, 2018, RAFARACI wrote to CC-3, "Dear [CC-3], Please pause sending money using [Financial Institution 1]. Too many questions and docs to provide."

49. On or about October 20, 2018, RAFARACI wrote to CC-3, "[CC-3], Did you stop the transfers? Haven't received anything." On or about October 21, 2018, CC-3 wrote back, "Dear Frank… The last payment may have been delayed. [The Maltese bank] had requested an explanation of this last payment."

50. On or about October 21, 2018, RAFARACI replied asking if everything had been worked out with the Maltese bank where the Malta Account was maintained.

11

51.     On or about October 22, 2018, CC-3 wrote to RAFARCI, "Frank[,] I saw your text this morning showing that the funds were credited to the account of Sinfonia. [The Maltese] bank are now asking that we provide copies of invoices for the last payment made from MLS to Sinfonia. Can I proceed with generating invoices for ship support services and passing on to [the Maltese] bank?" On or about October 23, 2018, RAFARACI replied, "Good morning [CC-3] Yes you can generate all the invoices you need."

52.     On or about December 15, 2019, RAFARACI emailed CC-3, "Dear [CC-3]… Please transfer to Keep Going programme (KG) AED 5.000.000 by Thursday 26 December." I know from other emails and my training and experience that "keep going" and "KG" is RAFARACI's code name for the money laundering scheme. I also know that "AED" often refers to the Emirati dirham, the official currency of the UAE. As of December 2019, 5,000,000 Emirati dirham would have been worth approximately $1.36 million.

53.     The money laundering scheme continued until at least 2020. For example, in or around early 2020, after repeatedly being questioned about the propriety of the transfers to Sinfonia by Anti-Money Laundering personnel at financial institutions in Malta and the UAE, RAFARACI began transferring U.S. Navy funds from the Malta Account to Rudis Limited, another RAFARACI shell company. On or about May 14, 2020, RAFARACI wrote to CC-3, "Try to insert in same [payment to MLS subcontractor] a payment to Rudis for keep going KG."

## CONCLUSION

54.     Accordingly, there is probable cause to believe that RAFARACI engaged in violations of criminal law, specifically one count of 18 U.S.C. § 371 (conspiracy to commit bribery), one count of 18 U.S.C. § 201 (bribery), ███████████████████████ ███████████████ and one count of 18 U.S.C. § 1956(h) (conspiracy to commit money

12

laundering).

Respectfully submitted,

*Cordell DeLaPena*

Cordell DeLaPena
Special Agent
Defense Criminal Investigative Service

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 on September 21, 2021.

_____
HON. ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

13